UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Insurance Company of the State of Pennsylvania,

      Plaintiff,

      v.                          Civil Action No. 2:06-CV-195

Kerrie A. Johnson, Administrator of the Estate
of Michael W. Johnson,

      Defendant.

## REPORT AND RECOMMENDATION
(Docs. 95, 99)

This declaratory judgment action involves a dispute between the Estate of Michael

W. Johnson ("Johnson") and the Insurance Company of the State of Pennsylvania

("ICSOP"), a commercial insurer.  The case arose when Sergeant Michael W. Johnson

("Sgt. Johnson"), a Vermont State Police Sergeant, was killed in the line of duty by Eric

Daley, an underinsured motorist.  At the time of Sgt. Johnson's death, the State of

Vermont ("the State") carried two excess liability policies with ICSOP.

The two policies at issue are generally described as follows.  ICSOP policy no.

4202-3938 provided a $10 million limit in excess of the State's $250,000 self-insured

retention ("SIR"), and insured against "liability imposed by law or assumed under an

insured contract because of bodily injury or property damage arising out of an occurrence

during the Policy Period."  (Doc. 97 ¶¶ 14-16.)  ICSOP policy no. 4202-3923 provided

identical coverage, but had a lesser $1 million limit in excess of the State's SIR, and

contained an endorsement limiting its application to "those occurrences and wrongful

acts for which the State of Vermont receives limited liability through the Vermont Tort Claims Act." *Id*. at ¶ 11.  After the State tendered to the estate its SIR limit of $250,000, Johnson commenced an action in state court for underinsured motorist ("UIM") benefits under the ICSOP policies.  In response, ICSOP commenced this declaratory judgment action, resulting in a stay of the pending related state court lawsuit.  ICSOP seeks a declaration that it has no obligation to provide UIM benefits to Johnson.

## I.      Procedural Background

The Court heard oral argument on the parties' initial cross-motions for summary judgment on December 3, 2007.  Following the recommendation of the Magistrate Judge, the District Court certified to the Vermont Supreme Court the question of whether Vermont's uninsured/underinsured motorist statute, 23 V.S.A. § 941, applies to excess liability policies.  Finding that the ICSOP "policies as worded would not provide coverage in this case," the Court recognized that ICSOP would not be obligated to provide UIM benefits to Johnson unless section 941 read such coverage into the policies. (Doc. 74 at 3; Doc. 68 at 5.)  On August 21, 2009, the Vermont Supreme Court answered the certified question in the affirmative, holding that excess policies that "provide coverage against liability arising out of the ownership, maintenance, or use of a motor vehicle" – such as the ICSOP policies at issue here – must provide UIM coverage in accordance with section 941.  *Ins. Co. of the State of Pennsylvania v. Johnson*, 2009 VT 92, ¶ 24, 987 A.2d 276, 286.

Following the Vermont Supreme Court's response to the certified question, the parties filed renewed cross-motions for summary judgment on the question of policy

coverage.  (*See* Docs. 95, 99.)  Initially, Johnson's Administrator sought a declaration with regard to both excess liability policies.  She has since refined her argument, however, and now contends that only ICSOP policy no. 4202-3938, which provides for $10 million in coverage, applies to Johnson's claim for UIM benefits.  (*See* Doc. 99 at 10-12.)

On June 7, 2010, a Report and Recommendation was filed which recommended that ICSOP's motion for summary judgment be granted and Johnson's motion be denied. (*See* Doc. 112.)  The Report and Recommendation concluded that: (1) the policies, as written, do not provide UIM coverage; and (2) Vermont's uninsured/underinsured motorist statute, 23 V.S.A. § 941, does not mandate underinsured coverage under the policies beyond the State's liability limits set forth in the Vermont Tort Claims Act ("VTCA"), and therefore the State's self-insured retention amount satisfied the requirements of section 941.  (*Id.*)  Given the latter determination, the Report and Recommendation concluded that it was unnecessary to consider the parties' other asserted bases for summary judgment.  (*Id.*)

On September 27, 2010, the District Court issued an Opinion and Order accepting in part and rejecting in part the Report and Recommendation.  (*See* Doc. 120.)  The District Court agreed that the policies as written do not provide UIM coverage, but held that the excess liability policies at issue here must provide UIM coverage with limits equal to the amount of excess liability coverage *actually purchased*, even where those limits exceed the caps placed on the State's own tort liability by the VTCA.  (*Id.* at 4.) The Plaintiff moved for reconsideration of that ruling and that motion for reconsideration

was denied in an Opinion and Order dated January 26, 2011.  (Doc. 126.)  Accordingly,

this matter has been recommitted to the Magistrate Judge with instructions to consider the

arguments raised in the parties' summary judgment motions but not reached in the initial

Report and Recommendation.

The facts of this case are recounted in detail in the June 7, 2010 Report and

Recommendation, and Judge Sessions accepted such recitation in his September 27, 2010

Opinion and Order.  Familiarity with those facts and the procedural background is

assumed.

## II.    The Parties' Remaining Summary Judgment Claims

ICSOP's remaining claims for summary judgment in its favor are as follows.

First, ICSOP argues that the excess policies need not offer UIM coverage because the

doctrine of sovereign immunity exempts the State from the requirements of section 941.

(*See* Doc. 95-1 at 13.)  Next, ICSOP contends that even if section 941 applies to the

excess coverage policies, the State "directed" that its UIM coverage be limited to

$250,000 as permitted by section 941(c).  ICSOP further asserts that its policies do not

apply because Daley's accident was not an "occurrence" and Sgt. Johnson was not an

"insured" within the meaning of the policies.  Finally, tucked away in a footnote in its

motion, ICSOP argues that Johnson has not established that all "other insurance"

available to Johnson has been exhausted.  (*See* Doc. 95-1 at 24 n.8.)

Johnson opposes ICSOP's claims, but does not assert any additional reasons for

judgment in its favor.

### III.    Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)(3).  The Court must resolve ambiguities and draw all reasonable inferences in favor of the non-moving party.  *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citation omitted).  "Where[,as here,] both parties have moved for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  *Murray v. Int'l Bus. Machs. Corp.*, 557 F. Supp. 2d 444, 448 (D. Vt. 2008) (citing *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)).

On summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue of material fact to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  *Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir. 1997) (internal quotation marks and citation omitted).  Moreover, credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters solely for the jury and thus may not be determined on summary judgment.  Fed. R. Civ. P. 56(e), 1963 Advisory Committee Note; *Anderson*, 477 U.S. at 255.

## IV.   Analysis

### A.   ICSOP Is Not Immune from the Requirements of 23 V.S.A. § 941.

ICSOP argues that section 941 does not govern its policies in this case because the insured, the State of Vermont, is a sovereign entity.  (*See* Doc. 95-1 at 13.)  According to ICSOP, the State's sovereign immunity from suit also mandates that "general words used in a statute such as 23 V.S.A. § 941 will not apply to the State to the detriment of sovereign rights or interests unless such an intent clearly appears from the statutory language."  *Id.* at 14 (citing *State v. Weeks*, 4 Vt. 215, 220 (1832) ("[G]enerally the crown, or government, is not bound by statutes, unless particularly named.")).[1]  Citing an absence of such clear intent to regulate the State in the text of section 941, ICSOP concludes that it is a statute with which the State, and, by extension, ICSOP itself, need not comply.

ICSOP's argument fails because even if the State is immune from section 941, it does not follow that ICSOP, a non-state entity, need not provide UIM coverage under the State's policies in this case.  Johnson's claim for benefits – at least in this federal action – is a claim upon ICSOP, not the State, and to absolve ICSOP of its obligations under section 941 merely because the State and its employees are its insureds would create rather than avoid a "detriment [to] sovereign rights or [State] interests."  In this case, section 941 can be applied to ICSOP consistent with the State's immunity (which is

---

[1]  Notably, the *Weeks* court recognized a number of exceptions to this rule of statutory construction, namely: "[W]hen an act of parliament is made for the public good, the advancement of religion and justice, or to prevent injury and wrong, the king is bound by the act, though not particularly named."  *Weeks*, 4 Vt. at 220.  The nuances of these exceptions, and whether section 941 falls within them, have not been addressed by the parties.

assumed *arguendo*) to ensure that the State and its employees are not disadvantaged relative to all other insureds.

In determining why Johnson's claim does not depend on whether the State must comply with section 941, the Court must first understand precisely what state immunity from section 941 would entail.  Section 941 directly regulates only insurers, requiring carriers to offer UIM coverage with all issued liability policies.  But it also indirectly regulates insureds insofar as they must – in accordance with other statutory requirements – maintain liability coverage for claims arising from motor vehicle accidents.[2]  Because section 941 precludes insurers from issuing liability policies without UIM coverage, all motorists in the State of Vermont must carry at least the minimum amount of UIM insurance as set forth in section 941.  Therefore, in its capacity as an *insured* or liability *policyholder*, immunity from section 941 would allow the State to direct its insurer to reduce UIM coverage to whatever amount it desired, including zero.  And logically, a private insurance carrier could issue the State a liability-only insurance policy without violating section 941, provided that the State directed it do so.

Primarily, though, section 941 regulates insurers.  The plain language of the statute is directed to insurers, providing that no automobile liability policy may be "delivered or issued for delivery" in this State "unless coverage is provided therein" for the insured's protection from uninsured and underinsured motorists.  23 V.S.A. § 941(a).

---

[2]  Under 23 V.S.A. § 800(a), Vermont's "financial responsibility law," "[n]o owner or operator of a motor vehicle required to be licensed shall operate or permit the operation of the vehicle upon the highways of the state without having in effect an automobile liability policy or bond in the amount of at least $25,000.00 for one person and $50,000.00 for two or more persons killed or injured and $10,000.00 for damages to property in any one accident."  Section 800(a) also permits motorists to self-insure in the amount of $115,000.  *Id.*; *see also Colwell v. Allstate Ins. Co.*, 2003 VT 5, ¶ 21, 819 A.2d 727, 734.

The Vermont Supreme Court has recognized an insurer's obligation under section 941 to inform policyholders that they may acquire UIM coverage in equal amount to liability. *Lecours v. Nationwide Mut. Ins. Co.*, 657 A.2d 177, 179 (Vt. 1995). Moreover, by mandating UIM coverage equal to liability unless "the policyholder otherwise directs," section 941 allows insureds to recover a windfall at the expense of their noncompliant insurer – that is, policies issued without UIM insurance, or with UIM coverage reduced without the policyholder's express consent, will be presumed to provide UIM coverage in an amount equal to liability even though the insured has not paid a premium for such coverage. *Dusharm v. Nationwide Ins. Co.*, 92 F. Supp. 2d 353, 357 (D. Vt. 2000); 16 Richard A. Lord, *Williston on Contracts* § 49:35 (4th ed. 2009). Therefore, immunity from section 941 would allow the State, in its capacity as a *self-insurer*, to provide only liability coverage for its motor vehicles without any UIM coverage for the benefit of its employees. *Cf. Colwell v. Allstate Ins. Co.*, 2003 VT 5, ¶ 19, 819 A.2d 727, 734 (holding that "self-insured employers have the same obligation as commercially insured employers to furnish UIM benefits to workers injured on the job by underinsured motorists").

Articulating the responsibilities from which the State would be freed in the absence of section 941 reveals that Johnson's claim for benefits does not depend on whether section 941 applies to the State or not. Johnson does not assert that the State failed in its obligations either to purchase UIM coverage as an insured, or to provide UIM coverage as an insurer. Rather, Johnson's claims are targeted directly at ICSOP's affirmative obligations under the statute. Put differently, the issue here is not whether the State should have purchased a particular insurance policy (the State purchased the ICSOP

8

policies, and did so, according to Johnson, *without* directing ICSOP to reduce UIM coverage),[3] or whether the State must provide UIM coverage as part of its self-insurance program (the State provided $250,000 in UIM coverage within its SIR, well above the statutory minimum), but whether ICSOP, a private insurance carrier, must provide UIM coverage within the policies it issued to the State.

ICSOP apparently believes that it need not comply with any facet of section 941 when its insured is the State of Vermont.  ICSOP's position would require accepting not only that private insurers may issue to the State liability policies without the minimum UIM coverage if the State so directs, but also that private insurers do not owe to the State the same affirmative obligations that section 941 prescribes in their dealings with all other insureds.  Immunizing ICSOP to this extent would make little sense given that section 941 principally regulates insurers rather than insureds, and ICSOP ostensibly seeks this narrowed statutory construction in order to protect the State's sovereign rights and interests.  Under ICSOP's application, section 941 would require insurers to offer UIM coverage equal to liability in all automobile liability policies, and to inform policyholders about their options to purchase UIM coverage, except when the insured is the State of Vermont.  Additionally, ICSOP's application would make Vermont State employees who are injured in the course of their employment, such as Sgt. Johnson in this case, the only motorists in the State who could not claim UIM benefits under a liability policy that is noncompliant with section 941, including in situations when the

---

[3]  Of course, ICSOP contends that the State did in fact direct that UIM coverage be limited to its $250,000 SIR, but that argument is relevant only in *applying* section 941, not in determining whether section 941 applies to these policies in the first place.

State did not waive UIM coverage.  Depriving the State and its employees of these benefits would only hinder the State's interests.  None of the cases on which ICSOP relies dispute this conclusion.  Both *Ross v. Transport of New Jersey*, 553 A.2d 12 (N.J. 1989) and *Gordon v. H.N.S. Mgmt. Co., Inc.*, 861 A.2d 1160 (Conn. 2004) involve sovereign immunity raised as a defense in suits against state actors, not private insurance companies with whom state actors contract.  In *Gordon*, unlike here, the defendant in the underlying lawsuit had not purchased automobile liability coverage at all, and the only question addressed on appeal was whether the defendant was an "arm of the state" entitled to invoke sovereign immunity from *suit*, not whether state actors are subject to Connecticut's UM/UIM statute.  *Gordon*, 861 A.2d at 1176.  And to the extent that *Gordon* is relevant to the question of whether state entities must comply with a UIM statute, *see Gordon*, 861 A.2d at 1176 n.28, the case does not address whether such immunity is transferred to the private insurance carriers with whom the state contracts. Here, of course, there is no claim that ICSOP is a state actor entitled to assert sovereign immunity independently of the State of Vermont.

Ross is inapposite for similar reasons.  *Ross* raised the question of whether a New Jersey state statute absolved the State of New Jersey of the statutory obligation to purchase UIM coverage as a corollary to not having to purchase automobile liability insurance at all.  *Ross*, 553 A.2d at 13-15.  Although the New Jersey Supreme Court found the State to be exempt from New Jersey's motor vehicle insurance laws, it based this holding on a specific statutory exemption rather than general principles of sovereign immunity, and never addressed the responsibilities of private insurance carriers who issue

insurance policies to state entities.  *Id*. at 19.  Moreover, the reasoning in *Ross* unequivocally rejects ICSOP's position in this case.  As the court explained, UIM "requirements do not apply to the [state] only to the extent that it is not insured.  If [the state-actor defendant] did decide to insure, then it would be forced by [New Jersey's UIM statute] to purchase UM coverage along with any other vehicle insurance."  *Id*. at 17. The same reasoning would apply if the state self-insured, "since the status of a self-insured is considered the equivalent of insurance, thus requiring the provision of UM coverage."  *Id*.  Here, the State of Vermont did decide to insure, and under *Ross*, section 941 would apply to the State – both as an insured and a self-insurer – to the same extent as any other policyholder.

But the critical inquiry is not whether these cases counsel in favor of or against applying section 941 to the State of Vermont, for the resolution of that question is entirely irrelevant to whether ICSOP must provide benefits in this case.  Instead, even assuming state immunity from section 941, the issue raised by Johnson's claim is whether private insurance carriers are absolved of all affirmative obligations otherwise required by Vermont's UIM statute merely because the State is the insured.  Both *Ross* and *Gordon* are confined to the responsibilities of state actors, which responsibilities are not implicated by Johnson's claim for benefits from ICSOP.  Thus, these cases do not support the proposition that state immunity bars UIM coverage on a claim like Johnson's, which asserts that the State purchased liability coverage from a private carrier without directing a reduction in standard UIM coverage.

In sum, ICSOP's assertion of immunity from section 941 finds support in neither law nor reason.  Even if the State itself is not governed by section 941, a finding that ICSOP and its policies are likewise immune is not logically compelled.  Such could be the case if the State affirmatively directed ICSOP to provide liability coverage without the concomitant UIM protection, but that is not Johnson's claim.  Additionally, exempting ICSOP from its affirmative obligation to offer UIM coverage when it insures the State would only harm the State's interests, thus undermining the very purpose that sovereign immunity is intended to serve.  Finally, requiring the State to affirmatively waive UIM coverage like all other insureds would not impose a burden upon the State, because it is only the insurer who must bear the cost of reducing UIM coverage without adequate consent.  For these reasons, section 941 governs the ICSOP policies, and summary judgment should not be granted in favor of ICSOP on this basis.

> **B.**    **The Undisputed Facts Demonstrate that ICSOP Failed in Its Duty to Inform the State that It Was Entitled to UIM Coverage Equal to Liability Coverage.**

Vermont law requires that automobile liability policies must provide UIM coverage equal to liability coverage, "unless the policyholder otherwise directs."  23 V.S.A. § 941(c); *see Dusharm*, 92 F. Supp. 2d at 357-58.  Although the direction to decrease UIM coverage below the liability coverage limit need not be in writing, "the burden of proof is on the insurer to show that the insured made a *knowing rejection* of higher . . . UIM coverage."  *Dusharm*, 92 F. Supp. 2d at 357 (emphasis added) (citing *Lecours*, 657 A.2d at 179).  In order for an insured's "rejection" of coverage to be "knowing," the Vermont Supreme Court has recognized that section 941 imposes upon

insurers a limited duty to inform.  *See Lecours*, 657 A.2d at 179 (citing *Auger v. State Farm Mut. Auto. Ins. Co.*, 516 So.2d 1024, 1026 (Fla. Dist. Ct. App. 1987) ("[T]he burden of proof of the insured's knowing rejection of higher uninsured motorist coverage limits is upon the insurance company[.]").  Specifically, "the insured must know that there are options with respect to [UIM] coverage and that the default option is coverage consistent with liability coverage."  *Lecours*, 657 A.2d at 179.  "A lesser requirement," explained the Court, "would be entirely inconsistent with the broad remedial purpose of the UM statute."  *Id.* (citing *Monteith v. Jefferson Ins. Co.*, 618 A.2d 488, 490 (1992) (basic philosophy of UM statute is to put insured in same position as if negligent driver had been as responsible as insured in obtaining liability insurance)); *see also Merkel v. Nationwide Ins. Co.*, 693 A.2d 706, 708 (Vt. 1997).

ICSOP argues that the State waived any UIM coverage in excess of its $250,000 SIR by directing ICSOP to carry only the $250,000 in UIM coverage, in accordance with section 941(c).  Johnson disputes that the State waived the standard UIM coverage within the meaning of section 941(c), on the grounds that the State never knew it was entitled to purchase greater UIM coverage as part of its ICSOP policies and thus never affirmatively "directed" ICSOP to reduce such coverage.  Significantly, the parties do not disagree about the historical facts surrounding the State's acquisition of the ICSOP policies.  Rather, they dispute whether those facts constitute a statutory "direction" to reduce coverage, and whether ICSOP's failure to inform the State of its right to purchase UIM coverage equal to liability coverage results in coverage at the default amount, i.e., equal

13

to the amount actually purchased, including the amount purchased by the State for the applicable excess liability policies.

To meet its burden of demonstrating that the State knowingly rejected higher UIM coverage in this case, ICSOP relies on the following evidence: (1) the State's Request for Proposal ("RFP"), which ultimately resulted in the offer and purchase of the ICSOP policies; and (2) the deposition testimony of William Duchac, who was the Insurance Program Manager for the Risk Management Division of the Vermont Department of Buildings and General Services when the ICSOP policies were procured. Preliminarily, it must be noted that an RFP for insurance is not itself an insurance contract. Rather, it sets forth the issuing party's requirements for the coverage sought and invites insurance companies to bid in the form of policy proposals.[4]  *See*, *e.g.*, *Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 626 (5th Cir. 2004) ("Burlington sought an insurer that would take over its parallel benefit programs . . . .  To this end, . . ., [it] directed its agent and broker . . . to submit a Request for Proposal to numerous life insurance companies, . . ., inviting them to bid on Burlington's life insurance program.").  On May 3, 2002, the State of Vermont issued an RFP for its insurance program through its insurance broker, Aon Risk Services, Inc. ("Aon").  (*See* Doc. 97 ¶ 18; Doc. 96-13.)  The RFP contained the State's particular "automobile liability specifications," which listed $250,000 as the requested amount of UM/UIM coverage.  (Doc. 96-13 at 50.)  In response, the State's Aon agent

---

[4]  The terms set forth in the RFP are not binding between an insured and its insurer unless specifically incorporated into the eventual insurance contact.  Indeed, the RFP issued by the State in this case explains that the State had "no preconceived ideas of what form this program should take," and invited "[a]lternate proposals" that could "take any form advantageous to the state."  (Doc. 96-13 at 45-46.)

hand-wrote ICSOP's coverage proposal on the RFP itself, indicating "No, within SIR" next to the State's request for $250,000 in UIM coverage.  (Doc. 96-9 at 24.)  ICSOP believes that the RFP and the State's eventual acceptance of ICSOP's proposal demonstrate that the State knowingly directed its UIM coverage be limited to $250,000.

ICSOP contends that this inference is further supported by Duchac's testimony. Pursuant to authority delegated to him by Commissioner of Buildings and General Services Thomas Torti, Duchac was responsible for designing the State's insurance program, drafting the RFP issued in this case, evaluating program proposals made in response to the RFP, and recommending to the Commissioner what form and type of liability coverage the State should ultimately carry.  (Torti Dep. at 5:13-17; Duchac Dep. at 26:24-27:14, 45:15-16.)  In addition, the RFP designated Duchac as the sole contact person for carriers submitting policy proposals, admonishing that "[a]ttempts by bidders to contact any other party could result in rejection of their proposal."  (Doc. 96-13 at 44.)

Duchac testified that: (1) he believed $250,000 in UIM coverage was sufficient, given the VTCA's $250,000 per person limit on liability claims against the State; (2) the State was aware of and attempted to comply with section 941 by providing UIM coverage equal to the liability limits established by the VTCA; and (3) had the State wished to purchase additional UIM coverage beyond the $250,000 SIR, it could have included such a requirement in the RFP used to solicit ICSOP's policy proposal.  Moreover, following Sgt. Johnson's accident, Duchac wrote to representatives of both ICSOP and Aon to say that Johnson would be entitled to only $250,000 "based on the per person limitation of

the tort statute as well as our specifications that clearly called for UIM at $250,000 (our SIR)."[5]  (Doc. 96-10 at 41.)

ICSOP believes that the State's request for $250,000 in UIM coverage, as stated in the RFP, combined with Duchac's testimony that the State – well aware of section 941 – purchased precisely the amount of UIM coverage that it wanted, shows as a matter of law that the State "direct[ed]" its UIM coverage to be less than the total amount of liability coverage provided by the ICSOP policies.  Johnson takes the opposite position, arguing that the State did not "direct" a reduction of its UIM benefits below the full limits of its excess liability coverage.  Johnson's position rests on two grounds: (1) Johnson's claim to enforce an insurance contract falls outside of the VTCA, and is therefore "exactly the type of claim from which the State intended to protect itself by buying excess coverage" up to $10 million (Doc. 101 at 8); and (2) regardless of what the State requested in its RFP, the matter of UIM coverage was never discussed with ICSOP, and the State therefore never specifically waived the UIM coverage that the excess liability policies are statutorily required to provide.

Johnson's theory that the State purchased $10 million in excess coverage to protect itself from contract claims is unavailing because it confuses the nature of Johnson's claim.  Johnson is correct that her claim falls outside the VTCA, but it does so not only because it is moored in contract rather than tort, but also because it is made against a private company and not the State.  It is therefore illogical to say that Johnson's

---

[5]  Significantly, however, in the same correspondence, Duchac added that "plaintiff's attorney . . . presents a fairly compelling case on the simple theory that there is no exclusion or limitation to coverage for UIM and therefore coverage applies, presumably up to the $10,000,000.00 limit."  (Doc. 96-10 at 41.)

"is exactly the type of claim from which the State intended to protect itself" with a $10

million insurance policy, because Johnson alleges nothing from which the State requires

protection in the first place.  There is no dispute that the State has already offered the full

amount of its SIR, and that any additional benefits would come from ICSOP, not the

State's coffers.

Johnson's argument that the State did not specifically direct ICSOP to limit the

UIM coverage under its policies is more persuasive.  This argument is not based on a

factual dispute, but rather, on the claim that the State's RFP request for $250,000 in UIM

coverage does not constitute a rejection of the default UIM coverage under section

941(c).  Contending that requesting a particular amount of coverage is not tantamount to

rejecting an offer of a higher amount of coverage, Johnson relies on Torti's testimony[6]

that (a) the State's RFPs set forth only minimum coverage requirements, and (b) he

"would see no reason to reject" an offer of higher coverage from insurers responding to

an RFP.  (Torti Dep. at 7:7-8:8.)

---

[6] There is a factual dispute regarding whether Duchac or Torti is better positioned to testify on behalf of the State.  Torti claims that he – as opposed to Duchac – has no knowledge regarding the specific policies at issue in this case.  Specifically, Torti testified in deposition that he had "[a]bsolutely no[]" independent knowledge of the insurance coverage at issue in this case; that he was not involved in the writing of RFPs generally; and that he had no recollection of reviewing the RFP to which ICSOP responded in this case; that he had never heard of Aon, the State's insurance broker; and that he never had any discussions with ICSOP or its agents.  (Torti Dep. at 6:7-10; 10:18-22; 13:4-9.)  But when asked if he was responsible for securing insurance coverage for the State of Vermont, Torti answered, "Yes, as delegated to the director of risk management, yes."  *Id.* at 5:13-17.  Thus, although Torti was required by statute to sign the insurance contracts formed with ICSOP (*see* Torti Dep. at 5:21-23), by his own admission, he delegated any further responsibilities to Duchac, a man with both insurance experience and expertise.  *See* 3 V.S.A. § 214 ("A . . . commissioner . . . may delegate any authority, power or duty other than a specific statutory authority of the office to a designee . . . .").  Nonetheless, by virtue of his position as Commissioner of Buildings and General Services, responsible for securing insurance coverage for the State (*see* Torti Dep. at 5:2-23, 15:17-20), Torti's testimony is relevant to the issue of whether, in general, the State might accept an offer of higher coverage from insurers responding to an RFP.  Of course, neither Torti nor Duchac testified that they understood the State to be carrying UIM coverage equal to the full liability limits of the ICSOP policies at the time of Sgt. Johnson's death.

As Johnson points out, it is undisputed that neither Duchac nor anyone else on behalf of the State specifically declined UIM coverage equal to the liability limits under the ICSOP policies.  Duchac testified that he "never discussed" with ICSOP or Aon whether the ICSOP policies would include UIM coverage.  (Duchac Dep. at 76:24-77:5.) And Torti testified that he has "no recollection . . . about what coverage the State had for UIM[,]" and never discussed the State's insurance coverage with anyone from Aon or ICSOP.  (Torti Dep. at 12:21-13:9.)  ICSOP even admits in its papers that "[t]he State never considered procuring more than $250,000 in UM/UIM coverage."  (Doc. 95-1 at 12.)  Thus, although the State specifically requested $250,000 in UIM coverage through its RFP, it never had occasion to "knowing[ly] reject[]," *Lecours*, 657 A.2d at 179, greater coverage because such coverage was never offered by ICSOP.

These facts distinguish this case from *Lecours*, where the appellate court found in favor of the insurer, affirming the lower court's decision that "it was more likely than not that [Lecours, the insured,] had directed that UM coverage be lowered to the statutory limits."  *Lecours*, 657 A.2d at 178.  Unlike the State here, Lecours "had enjoyed UM coverage equal to his liability coverage . . . , *when he decided to make a change*."  *Id.* at 179 (emphasis added).  Also unlike this case, in *Lecours* there was evidence that Lecours "knew that he could continue UM coverage . . . with the same limits as his liability limits, knew that he could reduce those limits, expressed the desire to save money on his total premium, asked for such a change, and paid a prior premium in a manner that corroborated other evidence of adequate knowledge and information."  *Id.*  Specifically, the court in *Lecours* discussed testimony demonstrating that, when asked by Lecours

18

about possible ways to save on the policy premium, Lecours' insurance agent "reviewed options in a telephone conversation with Lecours, including the option of reducing UM coverage[,]" and in response, Lecours "requested that UM coverage be lowered." *Id.* This testimony was corroborated by a premium payment omitting the earlier, higher UM coverage premium. *Id.*

Given that this case reaches the Court on summary judgment, the Court must determine whether there are disputed facts regarding the State's alleged "direction" of a reduction of UIM coverage; and if there are, the issue is one for the jury and summary judgment must be denied. *See, e.g., Colwell*, 2003 VT 5, ¶¶ 31-33, 819 A.2d at 738-39 (remanding to trial court where the record contained conflicting evidence regarding question of whether self-insurer selected UIM coverage equal to statutory limits or liability limits); *compare Merkel*, 693 A.2d at 709 (summary judgment appropriate where the *Lecours* waiver standard was met as a matter of law, and the evidence demonstrated that plaintiff knowingly chose UIM coverage limit). There are no disputed facts on this issue, however. Rather, the undisputed facts demonstrate that, by law, the State could not have "directed" a reduction of UIM coverage because it was never offered UIM coverage up to the excess liability coverage amount, as it should have been. (*See* Doc. 120 at 4 (holding that "Under § 941, Excess Liability Policies Must Provide UIM Coverage With Limits Equal to the Amount of Excess Liability Coverage Actually Purchased").) *See Dusharm*, 92 F. Supp. 2d at 357 (holding that, although the direction to decrease underinsured limits need not be in writing, the insurer must demonstrate that the insured made a "knowing rejection" of higher UIM coverage) (citing *Lecours*, 163 Vt. at 159).

Stated differently, while the State indicated in the RFP that it desired to limit its UIM coverage to $250,000 (*see* Doc. 96-9 at 24), the State never had an opportunity to "direct" such coverage because it did not have an opportunity to "knowing[ly] reject[]" coverage equal to its liability coverage, as required by *Lecours* and *Dusharm*, due to ICSOP's failure to inform the State about its options with respect to UIM coverage. While the duty is not expansive, as explained above, ICSOP had a duty to inform the State that there are options with respect to UIM coverage and that the default option is coverage consistent with liability coverage before the State could make a knowing waiver of UIM coverage. Since the undisputed facts establish that such duty was not met (i.e., ICSOP never informed the State about UIM coverage), no knowing waiver occurred, and the default UIM coverage amount is that amount purchased for liability coverage, including the coverage purchased in the subject excess liability policy. *Lecours*, 657 A.2d at 179.

In sum, given (a) the Vermont Supreme Court's recent holding in this case that excess policies providing coverage against liability arising out of the ownership, maintenance, or use of a motor vehicle – such as the ICSOP policies at issue in this case – must provide UIM coverage in accordance with section 941; (b) this Court's subsequent determination that the excess policies at issue here must provide UIM coverage with limits equal to the amount of excess liability coverage actually purchased, unless otherwise directed by the insured; and (c) the State's failure to "direct" UIM coverage with limits less than the liability coverage purchased, as a result of ICSOP's failure to offer coverage up to such limits; I recommend that this Court find in Johnson's

favor with respect to this issue, requiring ICSOP to provide coverage in an amount equal to the amount of excess liability coverage actually purchased by the State in policy no. 4202-3938.

### C.    Sgt. Johnson Was an "Insured" Who Died as a Result of an Occurrence.

Alternative to its arguments relating to application of section 941, ICSOP argues that coverage does not lie in this case because Sgt. Johnson was not an "insured" and the accident with Eric Daley was not an "occurrence" within the meaning of the policies' coverage provisions.  Each argument fails.

### i.    Sgt. Johnson Was an "Insured."

ICSOP's argument that Sgt. Johnson was not an "insured" at the time of his death is easily dismissed.  The policies provide that an "insured" is "[a]ny of [the State's] employees, servants, or volunteers while acting within the course and scope of their employment or duties as volunteers," and there is no dispute that Sgt. Johnson was a State employee acting in the course of his employment at the time he was killed. Contrary to ICSOP's position, nothing further is required for Sgt. Johnson to qualify as an "insured" for the purpose of collecting UIM benefits.

ICSOP contends that Sgt. Johnson cannot recover UIM benefits because he was outside of, and therefore not "using," his state police cruiser when the accident occurred. According to ICSOP, in the context of UIM coverage, the definition of an "insured" cannot simply be: "state employees within the course and scope [of their employment], . . . or 'automobile liability' coverage would have no connection to use of an automobile."

(Doc. 105 at 10.)  But ICSOP's view misses the point that a critical aspect of UIM coverage is its portability, and that UIM coverage insures people, not motor vehicles.  *See Monteith,* 618 A.2d at 490 (noting that "*the language of § 941 extends coverage to insured persons wherever they may be, provided that they are injured by an uninsured [or underinsured] motorist*") (quotation and citation omitted).  Thus, the extent to which Sgt. Johnson was "using" his car is entirely irrelevant, because insurers "may not 'condition coverage on the location of the insured nor the insured's status as a motorist, a passenger in a private or public vehicle, or as a pedestrian.'"  *Progressive Ins. Co. v. Brown*, 2008 VT 103, ¶ 13, 966 A.2d 666, 670 (quoting *Monteith*, 618 A.2d at 490).

ICSOP conflates the *amount* of UIM coverage, which necessarily entails reference to the amount of automobile liability coverage that is provided by a particular policy, with the *availability* of UIM benefits in the first place.  By providing coverage for liability arising out of the use, ownership, or maintenance of a motor vehicle, the ICSOP polices themselves provide the only "connection to use of an automobile" that UIM coverage requires.  Section 941 requires all policies providing such coverage to additionally provide UIM benefits to insureds under the policies, whether or not they were using an automobile at the time they were injured by an underinsured motorist.

### ii.    Sgt. Johnson Died as a Result of an "Occurrence."

The ICSOP policies provide coverage for bodily injury arising out of an "occurrence" during the policy period.  (Doc. 96-4 at 49.)  The policies define "occurrence" as "an accident . . . which results in bodily injury or property damage neither expected or intended from [the insured's] standpoint."  (Doc. 96-5 at 3.)  ICSOP

argues that Sgt. Johnson's death was not an accident, and therefore not an occurrence, within the meaning of its policies.  (Doc. 95 at 20-22.)  Preliminarily, however, it is at least worth noting that, in its supporting memorandum of law, ICSOP itself characterizes the events that led to Sgt. Johnson's death as an "automobile accident."  (*See, e.g.,* Doc. 95-1 at 1.)  Under Vermont law, the undefined term "accident" in an occurrence-based liability insurance policy means "an unexpected happening without intent or design." *City of Burlington v. Nat'l Union Fire Ins. Co.*, 655 A.2d 719, 721 (Vt. 1994).  "The unexpected nature of an accident describes the harm that is caused, rather than the act involved."  *Fine Paints of Europe, Inc. v. Acadia Ins. Co.*, No. 2:08-CV-81, 2009 WL 819466, at *6 (D. Vt. Mar. 24, 2009) (quotation marks and citation omitted).  Thus, an accident can occur under the ICSOP policies, despite the intentional nature of the insured's conduct, if the resulting *harm* – i.e., Sgt. Johnson's bodily injury resulting in death – was neither expected nor intended.  *Id.*; *see also Otterman v. Union Mut. Fire Ins. Co.*, 298 A.2d 547, 551 (Vt. 1972) (finding that existence of an "occurrence" turned not on whether the insured intentionally fired his gun, but on whether he intended the resulting harm).

In *Landry v. Dairyland Ins. Co.*, 701 A.2d 1035, 1036 (Vt. 1997), the Vermont Supreme Court held that section 941 requires automobile liability policies triggered by accidental occurrences to provide UIM coverage only when the harm is unexpected from the tortfeasor's perspective, that is, when the tortfeasor acted negligently rather than

intentionally.[17]  *See also, Bradley v. H.A. Manosh Corp.*, 601 A.2d 978, 983 (Vt. 1991)

(recognizing that section 941 is intended to "compensate accident victims for damages

caused by uninsured motorists who are found or are conceded to have been negligent").

This approach maintains consistency between UIM coverage and the standard third-party

liability coverage which UIM coverage is intended to supplement, given that liability

insurance generally does not afford coverage for intentionally-inflicted harm.  *See*

*Landry*, 701 A.2d at 1036 ("The uninsured motorist provisions are intended to put a

covered person in the same position as if the uninsured motorist had been insured. . . .

[and] [a] tortfeasor's insurance does not typically cover intentional acts.").

Applied here, whether Sgt. Johnson's death resulted from an "accident" turns on

the subjective expectations and intent of Eric Daley, i.e., whether Daley expected or

intended to harm Sgt. Johnson.[18]  With respect to Daley's intent, ICSOP does not claim

that Daley specifically intended to strike Sgt. Johnson with his car.  Instead, ICSOP

invokes the "inferred-intent rule," arguing that Daley's intent can be inferred from the

nature and character of his conduct.

---

[17]  A number of other jurisdictions have rejected this application of their UM/UIM statutes, finding that an accident occurs for the purpose of UIM coverage when the harm is unexpected from the perspective of the insured, i.e., the injured party, even if the underinsured tortfeasor acted with an intent to harm.  *See*, *e.g.*, *Wendell v. State Farm Mut. Auto. Ins. Co.*, 974 P.2d 623 (Mont. 1999); *Gen. Accident Ins. Co. of Am. v. Olivier*, 574 A.2d 1240, 1242 (R.I. 1990); *Gov't Emps. Ins. Co. v. Novak*, 454 So.2d 1116, 1118 (Fla. 1984); *Kish v. Cent. Nat'l Ins. Group of Omaha*, 424 N.E.2d 288, 293 (Ohio 1981).

[18]  Determining a person's expectation involves a different inquiry than does determining his or her intent.  *N. Sec. Ins. Co. v. Perron*, 777 A.2d 151, 158 n.8 (Vt. 2001).  In this case, however, ICSOP apparently does not dispute that Daley did not expect Sgt. Johnson's death; thus, the only analysis conducted here relates to Daley's intent.

ICSOP's argument fails for two reasons.  First, the Vermont Supreme Court has already decided this issue in upholding Daley's criminal convictions in *State v. Daley*, 2006 VT 5, 892 A.2d 244.  Relying on *Northern Securities Insurance Company v. Perron*, 777 A.2d 151, 156 (Vt. 2001), a case involving the issue of whether certain conduct qualified as an "accident" within the meaning of an occurrence-based liability policy, the Court in *Daley* found that Daley's crash into Sgt. Johnson "qualifies as an 'accident' . . . by any normal understanding of the term." *Daley*, 2006 VT 5, ¶ 12, 892 A.2d at 249.

Second, and in any event, application of the so-called "inferred-intent rule" is inappropriate in this case.  Under the rule, "courts conclusively presume intent to harm as a matter of law based on the nature and character of the insured's alleged acts, regardless of whether the insured asserts that he or she had no subjective intent to injure." *Perron*, 777 A.2d at 158.  But in Vermont this rule has been applied primarily to claims for coverage arising out of instances of sexual abuse or harassment, cases, that is, in which the insured indisputably directed intentional conduct *toward the victim* but may not have done so with a specific intent to harm.  *See id.* (sexual abuse); *Concord Gen. Mut. Ins. Co. v. Madore*, 2005 VT 70, 882 A.2d 1152 (sexual molestation); *Serecky v. Nat'l Grange Mut. Ins.*, 2004 VT 63, 857 A.2d 775 (sexual harassment); *TBH v. Meyer*, 716 A.2d 31, 34 (Vt. 1998) (sexual exploitation); *Nationwide Mut. Fire Ins. Co. v. Lajoie*, 661 A.2d 85 (Vt. 1995) (sexual abuse); *see also AllState Ins. Co. v. Vose*, 869 A.2d 97 (Vt. 2004) (non-sexual child abuse).  In such cases, the insured's conduct is so "inherently harmful" that the law presumes harm was intended.  *Serecky*, 2004 VT 63, ¶¶ 24-26.

In this case, the question of whether intent to harm may be inferred from Daley's conduct does not arise because the harm was not caused by intentional conduct directed toward Sgt. Johnson.  According to ICSOP's version of the facts, Daley was leading police on a high-speed highway pursuit when he swerved to avoid a spike mat, and "lost control" of his vehicle before crossing into the median and striking Sgt. Johnson.  (Doc. 97 ¶¶ 1-3.)  It is undisputed that Daley did not intend to leave the roadway, spin into the median, and collide with Sgt. Johnson.  Rather, Daley's intent was merely to avoid the spike mat and evade the police.  The present case is closer to *Otterman v. Union Mut. Fire Ins. Co.*, 298 A.2d 547 (Vt. 1972), in which the Vermont Supreme Court held that an officer was killed as a result of an "accident" when he was shot through the wall in a darkened home.  An inebriated and belligerent man had entered the kitchen of a residence and fired one shot.  The shot pierced the kitchen wall and struck the officer who was positioned in the adjoining living room.  *Id.* at 549.  In concluding that the officer's death was accidental within the meaning of the shooter's occurrence-based liability policy, the court explained that although the shooter intentionally fired the weapon, he was unaware of the officer's presence in the room next door, and therefore could not have intended to harm the officer.  *Id*. at 550.

Similarly, the undisputed facts here show that Daley, although driving fast and swerving in and out of traffic, never intentionally directed any conduct toward Sgt. Johnson, and therefore never intended to harm Sgt. Johnson.  Indeed, and unlike the insured in *Otterman*, Daley did not even intentionally engage in the conduct that killed

Sgt. Johnson.  The inferred-intent rule should not be extended beyond those cases in which the insured intentionally directed the harmful conduct toward the injured person.

For these reasons, the Court should deny ICSOP's request for summary judgment on the grounds that Sgt. Johnson was not an "insured" and the accident with Eric Daley was not an "occurrence" within the meaning of the policies' coverage provisions.

### D.     "Other Insurance" Coverage

Finally, in a footnote in its motion for summary judgment, ICSOP argues that Johnson has failed to show that all "other insurance" possibly covering the loss has been exhausted.  In advancing this argument, ICSOP engages in no substantive legal analysis, other than to assert the general proposition that "other insurance" clauses in insurance policies are to be enforced.  (Doc. 95-1 at 24 n.8.)  Not surprisingly, Johnson responds in kind, setting forth in its own footnote only a general legal argument in opposition to ICSOP's claim.  (*See* Doc. 101 at 15 n.2.)

The Court should decline to engage in legal analysis of issues raised only in a footnote and in a perfunctory manner.  *See, e.g., John Doe, Inc. v. Mukasey,* 549 F.3d 861, 878, n.13 (2d Cir. 2008*); Calvert v. Wilson*, 288 F.3d 823, 836 (6th Cir. 2002) ("[I]t is generally held that an argument is not raised where it is simply noted in a footnote absent any recitation of legal standards or legal authority."); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 n.17 (1st Cir. 1999) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived.").  Only in a later reply does ICSOP advance the general argument that Johnson has failed to carry its burden of establishing pre-conditions to coverage.  (*See* Doc. 105 at 10.)  But even this cursory

argument is presented merely in the context of whether an "accident" occurred (which issue has already been addressed herein) and not whether "other insurance" exists.  In any event, ICSOP fails to analyze whether an "other insurance" clause is truly a condition precedent to coverage or a limitation on the amount of coverage.

Therefore, the Court should deny ICSOP's request for summary judgment on the grounds that Johnson has failed to show that all "other insurance" possibly covering the loss has been exhausted.

<u>**Conclusion**</u>

For the foregoing reasons, I recommend that ICSOP's motion for summary judgment (Doc. 95) as it relates to policy no. 4202-3938 be DENIED, and Johnson's motion for summary judgment (Doc. 99) as it relates to the same policy be GRANTED. In light of Johnson's explicit abandonment of the claim for coverage under policy 4202-3923 (Doc. 99 at 12) ICSOP's motion for summary judgment as to that policy should be GRANTED.

Dated at Burlington, in the District of Vermont, this 7th day of February, 2011.

<u>/s/ John M. Conroy</u>
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c).  Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).